o

```
               IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
                         LAREDO DIVISION

                                      §
UNITED STATES OF AMERICA              §
                                      §
                                      §
vs.                                   §  Civil Action No. L-10-100
                                      §  Crim. Action No. L-05-1659
                                      §
HUMBERTO GARCIA                       §
                                      §
```

MEMORANDUM AND ORDER

This Defendant filed a § 2255 Motion attacking his 2006 conviction for conspiracy with intent to distribute more than 1,000 kilograms of marihuana and possession with intent to distribute more than 100 kilograms of marihuana. After a jury trial, he was found guilty on both counts. He was sentenced to 360 months of imprisonment on November 6, 2006. (Crim. Dkt. 192 at 3.) The Defendant appealed to the Fifth Circuit Court of Appeals, which affirmed his conviction on March 5, 2008. (Crim. Dkt. 242, 243.) The Defendant filed a barebones § 2255 Motion on September 7, 2010 (Crim. Dkt. 261) and a Memorandum of Law in support of that Motion on October 8, 2009 (Crim. Dkt. 254). The somewhat unusual timing of these filings is explained in the Memorandum and Order of July 31, 2012, where this Court found that the Defendant's § 2255 motion was timely filed. (Crim. Dkt. 310.) Accordingly, only the merits remain to be decided.

The Defendant makes the inevitable claim of ineffective assistance of counsel. (Crim. Dkt. 254.) He broadly claims ineffective assistance at the pretrial, trial, sentencing, and appellate stages. (Id.) The Court has received a response to the motion from the Government (Crim. Dkt. 316), which is consolidated with a motion to dismiss the § 2255 motion (Crim. Dkt. 317). The Court has also received responses from Jose Eduardo Pena, the Defendant's counsel at the pretrial and trial stages (Crim. Dkt. 271), and David Almaraz, the Defendant's counsel at the sentencing and appellate stages (Crim. Dkt. 269).

Section 2255 relief is available only in limited circumstances. It is not meant to substitute for an appeal. United States v. Shaid, 937 F.2d 228, 231-32 (5th Cir. 1991) (en banc). Instead, generally, a conviction will be overturned only if the defendant raises "issues of constitutional or jurisdictional magnitude" and demonstrates "cause and actual prejudice." Id. That is, § 2255 relief is not used for the routine correction of run-of-the-mill legal or factual errors, particularly if these issues could have been raised on appeal.

Here, the Defendant raises ineffective assistance of counsel claims. The Defendant must show that his counsel's performance was so defective that it prejudicially violated his constitutional right to effective assistance of counsel. The Defendant must satisfy a two-pronged test under the familiar

2/18

Strickland standard, and the Court can consider the prongs in either order. Strickland v. Washington, 104 S.Ct. 2052, 2069 (1984). Under the first prong, the Defendant must show the defense counsel's performance "fell below an objective standard of reasonableness." Id. at 2064. The Defendant "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 2065 (internal quotation omitted). Under the second prong, the Defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 2068. Overall, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Id. at 2069. Applying the Strickland standard, the Fifth Circuit has held that "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." United States v. Jones, 287 F.3d 325, 331 (5th Cir. 2002) (quoting Garland v. Maggio, 717 F.2d 199, 206 (5th Cir. 1983)).

The Court will analyze the Defendant's claims in the same order that he provided. Therefore, the Court will deal in turn

with the Defendant's claims at the pretrial, trial, sentencing, and appellate stages.

A. Pretrial Claims

The Defendant first claims that Pena should have moved for dismissal under the Speedy Trial Act. (Crim. Dkt. 254 at 6-8.) The Defendant's initial appearance occurred on December 2, 2005 (Crim. Dkt. 102), and jury selection commenced on May 16, 2006 (May 16, 2006 Minute Entry). There is no dispute that, contrary to the Speedy Trial Act's requirements, the Defendant's trial began more than 70 days after his initial appearance, even after considering permissible exclusions. See 18 U.S.C. § 3161(c), (h).

However, Pena's failure to move for a dismissal under the Speedy Trial Act was a valid trial strategy, and so it was not ineffective performance under Strickland. Pena notes in his Response that he considered whether to waive the Speedy Trial Act or to move for dismissal of the indictment. He writes that he needed additional time to prepare for trial anyway, and so he decided not to move for dismissal. (Crim. Dkt. 271 at 2-3.) Pena's position that his decision to waive the Speedy Trial Act was strategic is bolstered by the contemporaneous evidence of a Speedy Trial Act waiver. (Crim. Dkt. 124.) The Defendant signed this waiver, which recited that he understood the Speedy Trial Act limits, he desired to waive these limits, and he had

4/18

"consulted with [his] attorney regarding the waiver of [his] right to be tried within the trial limits." (Id.) The waiver also specifies that "Defendant prefers to be tried jointly with Fidel Torres, co-defendant" (id.), providing an additional strategic reason for not challenging the Speedy Trial Act deadline. True, the waiver itself would not have prevented the Defendant from moving for dismissal under the Speedy Trial Act. Zedner v. United States, 126 S.Ct 1976, 1983-87 (2006). However, the waiver confirms that Pena's decision to forgo a Speedy Trial Act objection was strategic and was agreed to by the Defendant.

Further, the Defendant cannot show prejudice resulting from a violation of the Speedy Trial Act.[1] If the Defendant had moved to dismiss the indictment based on a Speedy Trial Act violation, the Court would have had two options: dismissing the indictment without prejudice or dismissing the indictment with prejudice.

The Court would have dismissed this case without prejudice. The Speedy Trial Act provides:

> In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

---

[1] This lack of prejudice is also relevant to the reasonableness of Pena's legal strategy.

18 U.S.C. § 3162(a)(2). Here, the alleged crime was quite serious, and the various co-defendants were facing lengthy prison sentences. The "facts and circumstances" of the case were that it was a complicated, seven-defendant case, and one of the co-defendants was challenging his mental capacity to stand trial (Crim. Dkt. 122, 123). Finally, reprosecution would have been consistent with the administration of justice, particularly because the Defendant himself acquiesced to some delay by signing the waiver. All of these factors would have led the Court to dismiss the indictment without prejudice, and the Government almost certainly would have reindicted the Defendant. Thus, there was no prejudice because the Defendant still would have been convicted, even if Pena had moved for dismissal of the indictment.

The Defendant's second claim regarding the pretrial phase is that Pena did not inform him of the risks of going to trial. (Crim. Dkt. 254 at 9-11.) He claims that, if he had understood that going to trial could result in his receiving a 360-month sentence, he would have entered a plea bargain for a ten-year sentence. (Id.) The Defendant also claims that he rejected the plea bargain because Pena incorrectly told him that he would have to testify against his co-defendants. (Id.) Pena's Response attaches a letter signed by the Defendant that

conclusively contradicts the Defendant's allegations on this point. (Crim. Dkt. 271, Ex. No. 1.) This letter made it clear to the Defendant that the Government was offering a ten-year minimum sentence if he pled guilty but that he would be facing a mandatory minimum sentence of twenty years if, before the plea or trial, the Government decided to file an enhancement based on his prior drug conviction. (Id.) While Pena's letter to the Defendant does not specifically mention that the Defendant could receive a sentence of 360 months, it does state that the Defendant was facing a maximum sentence of life in prison. (Id.) Further, the letter never mentions that the Defendant would be required to testify against his co-defendants. (See id.) In the letter, Pena recommends that the Defendant plead guilty. (Id.) The Defendant signed the letter, acknowledging that he had received it and that it was read and translated into Spanish for him. (Id.) The Defendant has not challenged the authenticity of his signature on this letter. Therefore, the record conclusively shows that his counsel was reasonably effective in explaining the plea offer to the Defendant. The Defendant has not shown a reasonable probability that some more detailed explanation of the plea offer would have caused him to plead guilty. Therefore, the Defendant has not shown prejudice, either.

B. Trial Claims

The Defendant next claims that Pena was ineffective because he did not object to several of the prosecutor's statements during closing arguments. (Crim. Dkt. 254 at 12-14.) He specifically points to a few of the prosecutor's statements. Thus, he objects to her statements suggesting that the Government witnesses were credible but the Defendant was not credible. The Defendant also points to two other comments by the prosecutor that: (1) "All of you were hand selected from this community . . . because we know that you are intelligent and we know that you won't let them get away with this," and (2) "And you observed Agent Nivar's demeanor. He has absolutely no reason to be making this up." (Id.) The Defendant argues that these statements demonstrate that the prosecutor was personally vouching for the Government's witnesses and personally attesting to the Defendant's guilt. (Id.) Some of the prosecutor's comments were questionable. However, Pena responds that he did not believe the prosecutor's comments were improper and, even if they were, he did not think they could "form the basis for dismissal, or even for a mistrial, considering the great quantity of evidence that the Government presented against Defendant." (Crim. Dkt. 271 at 4-5.)

Moreover, "[a] prosecutor's argument is reversible error only when so improper as to affect a defendant's substantial

rights," and "we assume that a jury has the common sense to discount the hyperbole of an advocate, discounting the force of the argument." United States v. Vaccaro, 115 F.3d 1211, 1215-16 (5th Cir. 1997). Here, the Defendant cannot show prejudice because, even if Pena's objections had been sustained, the Court at most would have directed the jury to disregard the statements. Given the length of the trial and the prosecutor's argument, as well as the strong evidence of the Defendant's guilt, there is no reasonable probability that the prosecutor's stray remarks during closing argument altered the jury's decision.

The Defendant argues that Pena was also constitutionally ineffective because he failed to call Oscar Palacios to testify. (Crim. Dkt. 254 at 14-16.) The Government presented videotape evidence of a conversation about drug trades between the Defendant and Palacios, who at the time of the videotape was cooperating with the Government in its investigation. (Id.) The Defendant contends that Pena should have called Palacios as a witness to testify about the content of the video.[2] (Crim.

---

[2] The Defendant also asserts that his Confrontation Clause rights were violated because Palacios did not testify. (Crim. Dkt. 254 at 14-16.) This argument is foreclosed by the Fifth Circuit's decision in this case, which found no Confrontation Clause violation because Palacios's comments were admitted only as context, not for the truth of the matter asserted. The Fifth Circuit also noted that Palacios was available to testify.

Dkt. 254 at 14-16.) The Defendant argues that, if Palacios had been called, Palacios could have been impeached by showing that he "allegedly committed additional crimes during the time" the videotapes were made and that Palacios had "reasons for cooperating" with the Government. (Id. at 15.) However, these methods of undermining Palacios's credibility were otherwise raised during the trial, and the Defendant does not demonstrate what Palacios's testimony would have added. The prosecutor herself introduced evidence that Palacios was involved in illegal alien smuggling while he was cooperating with the Government, which caused the Government to stop working with Palacios. (Crim. Dkt. 206 at 61-62.) Also, Pena questioned a government witness about Palacios's motives for cooperating with the government. (Id. at 81-82.) Finally, Pena argued that the videotapes were not to be trusted because Palacios was "a deceptive, slimy character." (Crim. Dkt. 209 at 640-41.) The Defendant has not shown how calling Palacios would have buttressed Pena's well-developed argument that Palacios was not trustworthy. Moreover, the Court expressly instructed the jury to consider Palacios's statements only as context for the Defendant's statements rather than for the truth of the matter asserted. (Crim. Dkt. 208 at 463-64.) Also, in his Response,

---

United States v. Garcia, 268 Fed. Appx. 317 (5th Cir. 2008) (per curiam) (unpublished); (Crim. Dkt. 243).

10/18

Pena states that he did not see any reason to require Palacios to testify because the incriminating part of the videotape was what the Defendant said rather than what Palacios said. (Crim. Dkt. 271 at 5.)  Overall, then, the Defendant has not shown that Pena's decision to not call Palacios was inadequate assistance or that the Defendant was prejudiced by this decision.

The Defendant's next complaint is that Pena did not advise the Defendant of the risks of testifying on his own behalf. (Crim. Dkt. 254 at 16-17.)  In particular, the Defendant argues that Pena instructed him to testify, and the Defendant was unaware that he could decline to testify. (Id.; Crim. Dkt. 254-1 at ¶ 6.)  He argues that this error prejudiced him because he was subjected to an obstruction of justice enhancement based on his testimony. (Crim. Dkt. 254 at 16-17.)  The Defendant's claim that he was unaware that he could decline to testify is flatly contradicted by the record.  The Court stated in the Defendant's presence in open court that he could decline to testify. (Crim. Dkt. 208 at 479.)  Further, Pena states in his Response that he thought that advising the Defendant to take the stand was the best legal strategy given the overwhelming evidence against him. (Crim. Dkt. 271 at 5-6.)  That advice was quite reasonable and was not ineffective.  An attorney must give his considered opinion about whether a defendant should testify,

11/18

but the Defendant was told by the Court that he had the option of whether or not to testify. Pena was not obligated to advise the Defendant of the obvious fact that he could be punished if he committed perjury on the witness stand.

The Defendant's final complaint against Pena is that he did not move for a mistrial when he learned that the Government had placed all of its cooperating witnesses in the same holding cell. (Crim. Dkt. 254 at 17-18.) The Defendant argues that the Government put all the witnesses in the same holding cell so they could collaborate on their testimony. (Id.) However, as Pena points out (Crim. Dkt. 271 at 7), he contended during his closing argument that the cooperating witnesses' stories were too consistent, partly because they were put in the same holding cell (Crim. Dkt. 209 at 625-26). Pena thus pursued a valid legal strategy, choosing to argue that the witness testimony was tainted rather than pursuing a mistrial. Moreover, the Defendant offers no legal support for the notion that a court must grant a mistrial merely because cooperating witnesses are housed together. (See Dkt. 254 at 17-18.) Accordingly, any motion for a mistrial on this basis would have almost certainly been unsuccessful. In fact, there are not an abundance of holding cells scattered around this courthouse, and it would have been difficult for the Government to prevent all contact

between the cooperating witnesses. The Defendant can show neither ineffective performance nor prejudice.

C. Sentencing Claims

The Defendant switched attorneys after he lost at trial. The Defendant's first claim against his new attorney, Almaraz, is that he failed to challenge the drug weight (6,057.51 kilograms) attributed to the Defendant in the Presentence Report. (Crim. Dkt. 254 at 19-22.) The Defendant acknowledges that Almaraz objected to the Presentence Report and asked for the Court to attribute a lesser drug quantity to the Defendant. (See Crim. Dkt. 254 at 20; Crim. Dkt. 172 at 1; Crim. Dkt. 269.) However, the Defendant maintains that Almaraz erred by failing to argue that the jury, rather than the Court, must determine the drug weight under the Sentencing Guidelines. (Crim. Dkt. 254 at 19-22.)

The Defendant misunderstands the law in this area. It is true that any fact which, by law, increases the maximum or minimum sentence for an offense must be submitted to the jury. Alleyne v. United States, 133 S.Ct. 2151, 2155 (2013). For example, for a marihuana offense such as the one in this case, the statute, 21 U.S.C. § 841, provides for a maximum sentence of five years if the amount of marihuana is less than 50 kilograms; a mandatory minimum sentence of five years and a maximum of forty years if the amount is 100 kilograms or more; and a

mandatory minimum sentence of ten years and a maximum of life if the amount is 1,000 kilograms or more. Within those ranges, it is the sentencing judge's responsibility to determine the amount of the marihuana for which the Defendant is responsible. Thus, "when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." United States v. Booker, 125 S.Ct. 738, 750 (2005).

Here, the verdict form specifically asked the jury to find the weight range of marihuana for which the Defendant was responsible. (Crim. Dkt. 145.) The jury found that the Defendant was responsible for 1,000 kilograms or more of marihuana, and this fact determined the Defendant's mandatory minimum sentence. It was then the Court's responsibility to make a determination as to the precise drug weight above 1,000 kilograms. For sentencing purposes, the probation office used guidelines that applied to at least 3,000 but less than 10,000 kilograms of marihuana. (Crim. Dkt. 159 at ¶ 43.) This Court considered abundant evidence to find that the Defendant's "responsibility could easily be 6,000 kilos," meaning that the probation office's scoring on this point was correct. (Crim. Dkt. 210 at 18-19.) Almaraz's decision not to pursue an entirely frivolous legal argument was clearly reasonable.

Furthermore, the Defendant has not shown prejudice because the argument would not have been successful.

The Defendant next argues that Almaraz should have objected to the Court applying the Sentencing Guidelines as if they were mandatory. (Crim. Dkt. 254 at 22-24.) The Defendant offers no proof that the Court did so, but merely protests that the Court did not explicitly mention that the Guidelines were advisory. (See id.) This Court was well aware that the Sentencing Guidelines were advisory but also that they were not to be ignored. The Statement of Reasons signed by the Court explicitly mentioned that the Sentencing Guidelines are advisory and the Court could deviate from them. (Crim. Dkt. 193 at 2.) Almaraz again did not err by failing to make this frivolous legal argument that would have been unsuccessful. Therefore, neither prong of Strickland is met.

D. Appeal Claims

The Defendant next argues that, on appeal, Almaraz should have challenged the sufficiency of the evidence regarding the quantity of drugs. (Crim. Dkt. 254 at 25.) Almaraz responds that he thought such a sufficiency challenge was unlikely to prevail on appeal. (Crim. Dkt. 269 at 1-2.) The Defendant does not contradict Almaraz's reason for not pursuing a sufficiency-of-the-evidence appeal. Moreover, after considering the compelling evidence of the Government and the Defendant's

testimony, the Court agrees that an evidentiary sufficiency point was futile. The Court concludes that failure to raise this fruitless point on appeal was not ineffective assistance of counsel.

The Defendant also argues that, on appeal, Almaraz should have challenged the two-level obstruction of justice enhancement. (Crim. Dkt. 254 at 26.) The Defendant argues that the enhancement should not have been applied because he had a constitutional right to take the stand on his own behalf and because he admitted his guilt, albeit to a lesser quantity of drugs. (Id.) The sole authority he cites for this claim is Application Note 2 of Sentencing Guideline § 3C1.1. However, while that Note provides that the enhancement should not be applied based solely on a "defendant's denial of guilt," the Note contains the further provision that the enhancement may be applied if the Defendant makes "a denial of guilt <u>under oath that constitutes perjury</u>." U.S.S.G. § 3C1.1, Application Note 2 (emphasis added). At sentencing, the Court found that, "listening to you and listening to all the other witnesses, I would have to say, without any doubt, that your version was simply not true." (Crim. Dkt. 210 at 20.) The Defendant does not demonstrate how he could have convinced an appellate court that the Court's finding was incorrect. To the extent that the Defendant argues that the enhancement is generally an

16/18

unconstitutional burden on the right of defendants to testify, that argument is foreclosed by Fifth Circuit precedent. See United States v. Vaquero, 997 F.2d 78, 85, 87-88 (5th Cir. 1993).

The Defendant next argues that Almaraz should have argued on appeal that there were multiple conspiracies, meaning that a jury question should have been submitted regarding multiple conspiracies and Almaraz should have brought an evidentiary-sufficiency claim on appeal. (Crim. Dkt. 254 at 27-28.) The Court did give a multiple-conspiracies jury instruction. (Crim. Dkt. 209 at 692-95, 701.) Therefore, the Defendant's complaint that such an instruction should have been given fails. Further, Almaraz states that he did not bring this evidentiary sufficiency point on appeal because he thought that it was unlikely to be successful. (Crim. Dkt. 269 at 2.) The Court agrees; there was substantial evidence that the Defendant was part of the larger conspiracy for which he was convicted.

The Defendant finally protests that these two appellate claims should have been made: first, that the Sentencing Guidelines were applied as if they were mandatory and, second, that there was prosecutorial misconduct because the prosecutor made an improper closing argument and allowed the cooperating witnesses to be placed in the same holding cell. (Crim. Dkt. 254 at 28-29.) As the Court has already explained, these claims

would have failed at the trial level. Similarly, they would have failed on appeal. Narrowing the appeal to the single, most valid claim was a reasonable legal strategy on Almaraz's part. The Defendant has shown neither ineffective performance nor prejudice on these issues.

The Court concludes that this § 2255 Motion has no merit, and the Government's Motion to Dismiss (Crim. Dkt. 317) is **GRANTED.**

DONE at Laredo, Texas, this 27th day of January, 2014.

_____
George P. Kazen
Senior United States District Judge